IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARK LANGLOIS,**  Case Number 3: 15 CV 579

    Petitioner,  Judge Patricia A. Gaughan

    v.  Magistrate Judge James R. Knepp, II

**JOHN COLEMAN, WARDEN,**

    Respondent.  REPORT AND RECOMENDATION

### INTRODUCTION

Petitioner Mark Langlois ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act ("AEDPA") codified as 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Coleman ("Respondent") filed a Return of Writ (Doc. 5) with attached exhibits, and Petitioner filed a Traverse (Doc. 7).[1] The district court has jurisdiction according to § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated April 1, 2015). For the reasons discussed below, the undersigned recommends the Petition be denied.

### FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, the state court's factual findings were erroneous. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir.

---

1. Traverse is now termed a Reply. *See* Advisory Committee Notes (1976) to Rule 5 of Rules Governing Section 2254.

2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. Ohio's Sixth District Court of Appeals set forth the following findings of fact:

### A.  The Crime

[¶2] On the morning of January 27, 2011, a homicide occurred at Forklifts of Toledo (FOT) where Langlois was employed. Sometime between 7:50 a.m. and 8:30 a.m., the victim, Jim Schueler Jr., died of a gunshot wound to the head. Schueler, who was the manager at FOT, was in his office enjoying a cup of yogurt and a banana when he was killed. For about two years he had been on a "health kick", and each morning it was his habit to eat this same breakfast. Janice Albright, the fleet manager, last saw Schueler alive when she passed his office at 7:52 a.m. His back was to the doorway and he was seated at his desk eating. Albright then left the front office area to get coffee and was away until after 8:00 a.m. She testified that if someone entered the office who Schueler knew, he would continue to eat without stopping. But if he saw a customer or stranger, he "would stop eating, set his food on his desk, get up and introduce himself." At approximately 8:30 a.m., another FOT employee, Chris Fordham, discovered Schueler sprawled on the floor next to his desk. His chair was overturned and pieces of the banana and yogurt covered his face. Thinking Schueler had suffered a heart attack Fordham and another employee attempted to revive him through CPR while Albright called 9-1-1. They stopped when they saw blood coming from the back of his head. Paramedics and Toledo police officers arrived soon afterward.

### B.  The Investigation

{¶ 3} It was quickly apparent to the crime scene investigators that Schueler was murdered with some type of 9mm semiautomatic pistol because a spent shell casing in that caliber was found next to his body. An autopsy later determined that he was shot once at point-blank range. The bullet entered just behind the right ear, traversed sharply downward, and exited the left side of his neck. Investigators eventually recovered the bullet in the room near the desk. Since no gunshot was heard, police surmised that a sound suppressor must have been attached to the barrel of the pistol. The ambient noise from shop machines operating adjacent to Schueler's office would also have contributed to muffling a gunshot.

{¶ 4} Almost immediately police suspected that an FOT employee had killed Schueler even though no motive was apparent. There were no signs of a struggle, forced entry, or theft. Nor was there any indication that someone had entered FOT through the front door before the murder. Whenever that door was opened, it would trigger a chime to alert those working in the front offices that someone was entering. No one there had heard the chime sounding within the time frame of Schueler's murder. That left only the possibility of accessing the front office from the shop area. Consequently, all FOT employees were ordered to remain on the premises while police secured Schueler's office and gathered evidence.

### C. A Suspect

**{¶ 5}** When Langlois arrived at FOT that morning it was extremely cold and snowing with a bitter wind driving the snow. A five-year employee and one of three shop mechanics, he had expected to work, as he usually did, inside the FOT facility that day. However, because a road technician called in sick and service was needed on a vehicle at a customer's business, Art Martin, FOT's service manager, assigned that task to Langlois. This prompted an angry response during which Langlois expressed frustration at being made to work outside in the cold. Despite the outburst, Martin ordered him to pack up and get started. At 7:20 a.m., Langlois, still visibly agitated about the assignment, began loading tools into an FOT truck to drive to the worksite. He did not leave the facility, however, until just before 8:00 a.m. This time was confirmed by both a GPS tracking device attached to the FOT truck that Langlois used and a videotape from a surveillance camera atop a car wash next to the FOT property. A fellow employee also saw Langlois leaving the front office before departing, "look[ing] like he was mad at the world". Another employee would later testify that the mechanics rarely visited this part of the building.

**{¶ 6}** Langlois returned to the FOT facility about 10:30 a.m., telling someone he came back for more tools and parts. He was already aware, from another employee's call earlier, that Schueler was dead; yet, despite that fact and the heavy police presence and the attendant commotion from fire department EMTs, Langlois appeared emotionless and disinterested. He asked no questions and seemed concerned only with getting back to his offsite assignment. At first he refused to be interviewed by the investigating detectives who, by then, had gathered all the FOT employees into one room. Langlois told one detective that he "was not here" when Schueler was killed. Witnesses who saw Langlois at this point described him as looking "shaky" and "nervous".

**{¶ 7}** Later that day all the employees, including Langlois, went to the Toledo Police Safety Building to be interviewed and give statements. During questioning, Langlois was asked whether he stopped anywhere after leaving FOT for the assigned work site. Langlois said he drove directly to the location of the job assignment. However, the tracking data from the GPS device on the FOT truck revealed that he had stopped at his home for about five minutes before going on to the work site. Langlois acknowledged that he owned "a lot" of guns and had a concealed-carry permit. He agreed to give police two of his 9mm semiautomatic pistols for examination, one of them a Beretta and the other a Glock model 26. Subsequently, police executed a search warrant on his home and recovered more handguns, ammunition, sound suppressors, and numerous types of firearms paraphernalia.

### D. Trial

**{¶ 8}** Langlois was eventually indicted on one count of aggravated murder in violation of R.C. 2903.01(A) and (F), and one count of murder in violation of R.C. 2903.02(B), along with firearms specifications as to each count. At trial, the state's evidence included the spent 9mm shell case recovered from the murder scene and the bullet that killed Schueler. One of the state's experts, David Cogan, testified about his comparative ballistics testing using Langlois' 9mm Glock 26.

Specifically, Cogan compared both the bullet and the shell case from the crime scene with a spent bullet and the shell case produced through a test-fire procedure with the Glock 26. The comparison confirmed that the crime-scene shell case matched the one test-fired in the Glock, but the bullets did not match. The state theorized that the inconsistent results with the bullets were due to the fact that Langlois had used a different barrel in the Glock for the murder and then disposed of it afterward. Police were never able to find that barrel. A second ballistic expert testified that he reviewed Cogan's examination and testing of the shell cases, verified that his procedure was correct, and agreed that the crime-scene shell case came from Langlois' Glock 26.

{¶ 9} An assistant coroner testified that she found small abrasions and slight deposits of soot around the entrance wound on the back of Schueler's head. This indicated that the pistol had been placed close to the skin, resulting in an imprint of "contact wound." She noted, however, that in a "true contact wound," where the muzzle of the weapon is directly *on* the skin when fired, there is much more soot found in and around the entrance wound. The very slight amount of soot in Schueler's wound could indicate that a suppressor was used on the barrel. On cross-examination, however, she conceded there might be "other possible explanations too."

{¶ 10} In an effort to substantiate its theory that Langlois had killed Schueler with the Glock 26 using a different barrel and a suppressor, the state introduced, over objection, a large number of exhibits which tended to show his familiarity with firearms, their component parts and method of assembly, and the use of sound suppressors on pistols. This evidence included other handguns, the suppressors and their adaptors, magazines, spare barrels, scopes, holsters, quantities of ammunition of different calibers, spent shell casings, tools for repairing firearms, reloading components and tools for making ammunition, as well as books, periodicals and DVDs all relating to firearms and shooting.

{¶ 11} Additionally, through the testimony of Detective James Dec, the state introduced Langlois' internet browsing history recovered from his home computer. Defense counsel did not object to this evidence. The browsing history showed that Langlois had visited websites pertaining to firearms, gun parts, and replacement barrels "hundreds of times," and had used on-line search engines for those subjects repeatedly. Dec could not identify the dates of these visits and searches, however, in relation to the date of Schueler's murder, because of the "particular way the internet history was logged." Dec's analysis also uncovered the browsing of websites devoted to the topic of pistol suppressors. This history indicated "hundreds if not thousands of searches for silencers or suppressors." Within that history, Dec found that Langlois had searched websites pertaining to suppressors that would fit the specific models of Glocks he owned. There were also searches for "drop-in" replacement barrels, some of them made for use with a suppressor. Again, Dec could not identify from the file paths when Langlois had visited those sites. Finally, an investigating detective testified that Langlois had legally acquired all of the firearms, ammunition, barrels, and other gun parts found in his home. The detective also verified that the suppressors were legal for

4

him to possess because they were properly registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

(Doc. 5-1, Ex. 9).

## PROCEDURAL BACKGROUND

The relevant procedural history is undisputed by the parties and was accurately summarized in Respondent's brief, therefore it is incorporated herein with only minor changes. (Doc. 5, at 5-8).

### State Trial Court

The January term of the 2011 Lucas County Grand Jury indicted Langlois on one count of aggravated murder and one count of murder, each with firearm specifications. (Doc. 5-1, Ex.1). Petitioner pleaded not guilty to the indictment. (Doc. 5-1, Ex. 2).

A jury found Petitioner guilty of both murder counts and the firearm specifications. On November 29, 2011, the trial court merged the murder counts and sentenced Petitioner to life in prison without the possibility of parole, consecutive to a mandatory three-year sentence for the firearms specifications. (Doc. 5-1, Exs. 3-4).

### Direct Appeal

On December 20, 2011, Petitioner, represented by counsel, filed a notice of appeal with the Sixth District Court of Appeals, Lucas County. (Doc. 5-1, Ex. 5). Petitioner, through new counsel, raised three assignments of error in his brief:

Assignment of Error No. 1

Because ballistics evidence indicating that a particular shell casing was fired by a particular handgun cannot satisfy the reliability standard of Evid.R. 702, *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), and *State v. Nemeth*, 82 Ohio St.3d 202, 694 N.E.2d 1332 (1998), its wrongful admission in this case denied appellant a fair trial, the right to present a defense, and due process as required by the Sixth and Fourteenth Amendments to the United States Constitution, and counsel's representation was constitutionally ineffective for failing to move or pursue a motion to preclude the evidence on that basis.

5

<u>Assignment of Error No. 2</u>

The trial court's wrongful admission of firearms, books and periodicles [*sic*], videotapes, tools, parts, ammunition, and computer search data, coupled with its failure to give a limiting instruction, was unduly prejudicial and violated appellant's rights to a fair trial, to present a defense, and to due process all as guaranteed by the Sixth and Fourteenth Amendments and by the cognate provisions of the Ohio Constitution.

<u>Assignment of Error No. 3</u>

Appellant received constitutionally ineffective assistance of counsel when his trial counsel failed to object to the admission of a wealth of highly prejudicial and misleading evidence on the basis that its admission violated Evid.R. 403, failed to seek a limiting instruction when the court admitted the evidence for a single and limited purpose, and failed to object when the state made highly prejudicial and improper use of the evidence during closing argument.

(Doc. 5-1, Ex. 6). The State filed a responsive brief, to which Petitioner replied. (Doc. 5-1, Ex. 7).

On November 22, 2013, the Court of Appeals affirmed the judgment, addressing each of Petitioner's three assignments. (Doc. 5-1, Ex. 9). The affirmation was based on the court's determination that (1) the ballistics evidence met the threshold test for reliability and there was no evidence a *Daubert* hearing would have been more effective than cross-examination; (2) introduction of the internet browsing history was not plain error because it was relevant to the method of the murder and the probative value was not substantially outweighed by the risk of unfair prejudice; and (3) hindsight criticism of tactical decisions is insufficient to demonstrate ineffective assistance of counsel. (Doc. 5-1, Ex. 9 at 96-100, 114-19, 129-31).

*Ohio Supreme Court*

On January 6, 2014, Petitioner, through new counsel, filed a notice of appeal to the Ohio Supreme Court. (Doc. 5-1, Ex. 10). Petitioner had two propositions of law:

**Proposition of Law I:** Expert testimony comparing tool marks on shell casings is not scientifically sound and cannot be presented as scientific expert testimony, because the theory underlying such comparison has not been adequately tested,

> the methods for comparison are not capable of proper peer review, and the error rate is unknown.
>
> **Proposition of Law II:** A defendant is denied the effective assistance of counsel when counsel fails to move for exclusion of scientifically uncertain and unsound expert testimony.

(Doc. 5-1, Ex. 11). The State opposed the jurisdiction. (Doc. 5-1, Ex. 12). On March 26, 2014, the Ohio Supreme Court declined to accept jurisdiction. (Doc. 5-1, Ex. 13).

### FEDERAL HABEAS CORPUS

On March 25, 2015, Petitioner, through the same counsel, filed a federal petition for writ of habeas corpus under 28 U.S.C. § 2254 in this Court. (Doc. 1). Petitioner alleged a single ground for relief in the Petition:

> **GROUND ONE**: Expert testimony comparing tool marks on shell casings is not scientifically sound and cannot be presented as scientific expert testimony, because the theory underlying such comparison has not been adequately tested, the methods for comparison are not capable of proper peer review, and the error rate is unknown. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Mr. Langlois was therefore denied the effective assistance of counsel when counsel failed to move for exclusion of this scientifically uncertain and unsound expert testimony. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
>
> **Supporting Facts**: At Mr. Langlois's trial, David Cogan testified as an expert regarding his comparison of shell casings found at the scene of the crime and test-fired rounds from a firearm found in Mr. Langlois's possession. The process of comparing the shell casings to each other did not involve any special process, instruments, or computer analysis. It involved Mr. Cogan's own opinions as to whether or not certain features matched between the two shell casings. Counsel did not move to exclude the evidence under *Daubert* with the aid of current research and publications from the National Academy of Sciences and National Research Council. Instead, he tried to cross-examine Mr. Cogan, an approach that resulted in the jury hearing scientifically flawed and prejudicial testimony.

(sic.) (Doc. 1).

7

**JURISDICTIONAL ISSUES**

Respondent argues subpart one of the Petition should be dismissed as non-cognizable. (Doc. 5, at 9-10).

*Non-Cognizable Claims*

The Court will not have jurisdiction over Petitioner's claims for purposes of habeas corpus review unless they challenge the legality of his custody pursuant to a judgment of a state court based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Indeed, "the writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("[a] claim based solely on an error of state law is not redressable through the federal habeas process.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).

Nevertheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). "[T]he category of infractions that violate fundamental fairness is defined very narrowly", and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (citations omitted)); *see also Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993). The habeas petitioner bears the burden to show "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

Subpart One of Ground One

Subpart One of Ground One alleges the expert testimony and methodology of ballistics evidence is not scientifically sound and is unreliable evidence under *Daubert v. Merrill Dow*

8

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 1, at 14; Doc. 7, at 4). The Sixth District rejected this claim as follows:

> **{¶ 39}** Having reviewed the foregoing testimony, we conclude that it satisfies the threshold test for reliability under Evd.R. 702(C). It was not, therefore, plain error to admit it. Cogan and Wharton were properly qualified experts whose testimony helped the jury understand the basis for their tool mark examinations and the variables involved in comparing shell cases and projectiles. Such matters are well beyond the knowledge and experience of most laypeople, even among those who own firearms. Evid.R. 702(A).
>
> **{¶ 40}** Both experts used widely-accepted and accurate microscopic methods for observing minute striations and primer cup indentations on the cases being examined. They explained in detail how such markings are made by semi-automatic pistols generally, and then how and why a particular pistol will impart individualized, distinguishing marks that make a spent case or bullet traceable to that pistol. Such microscopic comparison testing is a generally accepted method of forensic analysis. *See State v. Onunwor*, 8th Dist. No. 93937, 2010-Ohio-5587, ¶ 14-18. It was, moreover, within the jury's prerogative to assess the weight to be given their testimony. *State v. Johnson*, 10th Dist. No. 05AP-12, 2006-Ohio-209, ¶ 15.
>
> **{¶ 41}** Our conclusion on this issue finds support in the decisions of other appellate districts in Ohio, notwithstanding the recent criticisms in scientific reports and the limitations some federal courts have imposed on the testimony of firearms experts. These decisions hold that the methodology of comparatively analyzing and testing bullets and shell cases recovered from crime scenes is reliable. *See Onunwor*, *supra*, at ¶ 14-18; *Johnson, supra*, at ¶ 13-15; *see also State v. Armstrong*, 11 Dist. No. 2001-T-0120, 2004-Ohio-5635 ¶ 63-66; *State v. Green*, 2d Dist. No. 2007 CA 2, 2009-Ohio-5529, ¶ 196-204.
>
> **{¶ 42}** Notably, Langlois offered no contrary testimony to refute the state's ballistics experts. Apart from a thorough cross-examination, he presented no credible challenge to the underlying physical or scientific theory of how marks are transferred from a firearm to the primary components of a cartridge, nor to the methodology of identifying a match between a particular gun and a shell case found at a crime scene. And despite his appellate counsel's characterization, neither witness opined in absolute terms or to a degree of "absolute certainty." Each expert stated his opinion to a "reasonable degree of scientific certainty." *See Montiero*, *supra*, 407 F. Supp. 2d at 372. Nor, finally, has Langlois attacked the jury's verdict on manifest-weight grounds or argued that the state's evidence is insufficient to sustain his conviction.

(Doc. 5-1, Ex. 9 at 25-27).

"[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). However, relief in habeas corpus for errors of state law, including evidentiary rulings, is cognizable where there is a denial of fundamental fairness. *Id*. The Court would only be entitled to overrule the state court's evidentiary ruling if it was found to "offend the principles of justice" to such a degree that a due process violation occurred. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citing *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). However, that is not the case here.

The undersigned agrees with the Sixth District's conclusion that the ballistics evidence and the related expert testimony satisfies the threshold reliability standard of Federal Rule of Evidence 702(C) and the reliability factors in *Daubert*. The evidence elicited was relevant and within the proper bounds of the proceeding such that the trial court did not create fundamental unfairness by admitting it into evidence. *See Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). As the Sixth District stated, the testimony was given by qualified experts whose testimony helped the jury understand the methodology and rationale for tool mark examinations and the variables of comparing ballistics evidence. (Doc. 5-1, Ex. 9 at 26). Other appellate courts in Ohio have held the methodology of comparative ballistics evidence is reliable. (Doc. 5-1, Ex. 9 at 26). Furthermore, Petitioner cited no federal cases in support of his allegation that the admission of this evidence created an unfair process which violated his fundamental rights. Subpart One of Ground One is non-cognizable and should be dismissed.

The Court will now review the remaining subpart of the petition on the merits.

### STANDARD OF REVIEW

When the basis for a federal habeas claim has been previously adjudicated by the state courts, AEDPA provides the writ shall not be granted unless the state court decision "was

10

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may grant habeas relief if either the state court arrives at a decision on a question of law opposite to that reached by the Supreme Court of the United States, or if the state court decides a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether the application in the state court adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams* at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). To obtain habeas review, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The habeas corpus standard is intentionally difficult and federal courts review state court decisions with "deference and latitude." *Id.* at 101-02.

*Ineffective Assistance of Counsel*

The Sixth Amendment guarantees the right to counsel, and the Supreme Court has recognized this right as the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy both prongs of the test set forth in *Strickland*: (1) counsel's performance was deficient such "that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment;" and (2) the deficient performance prejudiced the defense so as to deprive the defendant of a fair and reliable trial. *Id*. at 687; *Abby v. Howe*, 742 F.3d 221, 227-28 (6th Cir. 2014) (citing *Strickland*, 466 U.S. at 687-94). This Court may dispose of an ineffective

11

assistance of counsel claim by finding petitioner made an insufficient showing on either ground. *Id.* at 697.

To meet the deficient performance prong, counsel's representation must fall below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688. To meet the prejudice prong, there must exist a reasonable probability that, absent counsel's unprofessional errors, the results of the proceeding would have been different. *Id.* at 694. It is not enough to show error had "some conceivable" effect on the outcome but rather it is "reasonably likely [the decision would] have been different absent the errors." *Id*. at 693, 695.

When considering the prejudice prong, the court focuses on whether counsel's errors undermined the reliability of and confidence in the result. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993)). This is a high burden:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689.

Review of a *Strickland* claim is doubly deferential in a habeas proceeding. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) ("Judicial review of a defense attorney[] . . . is . . . highly deferential – and doubly deferential when conducted through the lens of federal habeas."); *see also Harrington v. Richter*, 562 U.S. 86, 105 (2011). This double deference arises because the *Strickland* standard is a general standard, giving a state court even more latitude to reasonably determine that a defendant has not satisfied the standard. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "A state court must be granted a deference and latitude that are not in operation

when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. Accordingly, the pivotal question in any habeas action presenting an ineffective assistance claim is "whether the state court's application of the *Strickland* standard was unreasonable." *Id*.

Subpart Two of Ground One

Petitioner must raise the same theories of ineffective assistance of counsel on habeas review as were presented to the Ohio appellate courts. *See Wong v. Money*, 142 F.3d. 313, 322 (6th Cir. 1998). Petitioner has alleged one ground for ineffective assistance of counsel: he was denied the effective assistance of counsel when counsel failed to move for exclusion of scientifically uncertain and unsound expert testimony. (Doc 1, at 14; Doc 7, at 4). Petitioner has not raised the additional grounds of ineffective counsel brought before the Sixth District, which included ineffective assistance for failing to seek a limiting instruction and failure to object to improper remarks during closing arguments; as such, he has waived review of these claim here. The Sixth District Court of Appeals addressed Petitioner's ineffective assistance claim, as it relates to the *Daubert* claim, as follows:

> **{¶ 83}** The first contention, that his counsel was ineffective for not citing Evid.R. 403(A) when objecting to the other-firearms evidence, is without merit. Even apart from the failure to raise that argument, we have already concluded that the probative value of this evidence was not substantially outweighed by the risk of unfair prejudice. Thus an additional objection under Evid.R.403(A) would have been properly overruled. Langlois' second claim regarding the failure to seek a limiting instruction on this evidence must also fail. Tactical considerations, as previously discussed, are a legitimate reason not to ask for such an instruction. *See Robinson*, 6th Dist. No. L-10-1369, 2012-Ohio-6068 at ¶ 74 (rejecting an ineffective assistance claim where defense counsel could reasonably believe that a limiting instruction would do more harm than good).
>
> * * *
>
> **{¶ 113}** The circumstantial evidence against Langlois was certainly compelling but not overwhelming. Defense counsel thoroughly questioned the basis for the experts' ballistics conclusions, attacked discrepancies as well as possible biases in the testimony of the FOT witnesses, pointed out gaps in the state's time-frame for the murder, and cited the lack of eyewitnesses and any understandable motive. Conversely, that same ballistics evidence, the videotape and the GPS data that

> contradicted Langlois' statements to police, and the logical coherence of the state's "means, motive and opportunity" theory all speak for themselves. Although it is a default truism to say that "closing arguments are not evidence," that merely begs the question of propriety in this case.

(Doc. 5-1, Ex. 9 at 36-37).

Upon review of the Sixth District's decision, a conclusion that is entitled to deference, the Court agrees that Petitioner's trial counsel was not deficient. *Harrington*, 562 U.S. at 101-02. The "Constitution guarantees only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Issac*, 456 U.S. 104, 133-34 (1982).

Here, Petitioner argues, without supportive case law, a *Daubert* hearing is the proper mechanism for challenging the admissibility of ballistics evidence. Additionally, Petitioner argues cross-examination relates to the credibility of the expert witness, not the reliability of the evidence. (Doc. 7, at 8, 10). It is not inadequate representation to cross-examine an expert witness instead of requesting a *Daubert* hearing, in fact it is the opposite. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington*, 562 U.S. at 111; *see Jackson v. McQuiggin*, 553 F. App'x 575, 582 (6th Cir. 2014)).

Furthermore, as the Sixth District decided, defense counsel's choice of cross-examination over moving for a *Daubert* hearing was a litigation strategy and thus is not deficient performance. The Sixth Amendment does not guarantee the right to perfect counsel. *Engle*, 456 U.S. at 133-34. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Counsel cannot be held responsible for tactical decisions that in hindsight seem unwise.

Regarding the prejudice prong, Petitioner argues the expert testimony, cloaked in scientific certainty, "was the crux of the case against him"; and thus, the cross-examination only served to underscore its reliability. (Doc. 7, at 10). However, as stated by Sixth District,

Petitioner's trial counsel "thoroughly questioned the basis of the experts' ballistics conclusions," a finding that is entitled to deference.

Petitioner failed in his burden of proving either the performance prong or the prejudice prong. The Sixth District's determination of the facts on the record and its application of the *Strickland* test were reasonable. Petitioner does not demonstrate that the outcome of the trial would have been different absent counsel's strategic litigation decisions. The Sixth District's determination is therefore entitled to deference. Petitioner's assertion to the contrary is without merit and this ground for relief should be overruled.

## CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Court deny the Petition.

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).